165 F.3d 32
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Lisa A. FELTNER, Plaintiff-Appellee,
v.
THE TITLE SEARCH COMPANY, Defendant-Appellant.
 Nos. 97-1087, 97-3413.
 United States Court of Appeals, Seventh Circuit.
 Argued April 2, 1998.
Decided Sept. 2, 1998.
 
 Appeal from the United States District Court for the Northern District of Indiana. South Bend Division. No. 95 C 217. Robert L. Miller, Jr., Judge.
 Before Hon. DANIEL A. MANION, Hon. ILANA DIAMOND ROVNER, Hon. DIANE P. WOOD, Circuit Judges.
 
 ORDER
 
 1
 The Title Search Company hired Lisa Feltner in January 1993 to work on real estate closings. A jury determined that she was sexually harassed by Walter Partyka, an officer, director, and part owner of Title Search, until September 1994 when she quit. For her injury, the jury awarded her $82,000 in damages. Title Search appeals, claiming that the jury's verdict was not supported by substantial evidence, and that the district court abused its discretion in allowing Ms. Feltner to file an untimely application for attorneys' fees. We affirm.
 
 I.
 
 2
 Title Search Co. is incorporated in and has its principal place of business in the state of Indiana. Between January 1993 and September 1994, Therese Partyka owned 60 percent of the corporation, and her husband, Walter Partyka, owned 40 percent. Mrs. Partyka is also the president of the company, while Mr. Partyka was, during the relevant time period, the secretary-treasurer. Title Search Co. is in the business of completing real estate purchases (including loan documentation and title preparation and filing).
 
 
 3
 In January 1993, Lisa Feltner began working as a staff member of the Closing Department, and in May 1993, Mrs. Partyka promoted her to supervisor of the Closing Department. Mr. Partyka was Ms. Feltner's supervisor. Soon after Ms. Feltner joined Title Search, Mr. Partyka began paying her an inordinate amount of attention. He made comments about her appearance and touched her hair and shoulder. He frequently hovered over her and stared at her. Once, while working at her desk, Ms. Feltner removed her shoes. Mr. Partyka approached her, saw her polished toenails, and commented "How did you know that polished toenails turn me on?" Ms. Feltner, disgusted and humiliated, ignored him.
 
 
 4
 This daily harassment only escalated. On Valentine's Day, 1993, Mr. Partyka gave Ms. Feltner a scarf, supposedly from a secret admirer. After Ms. Feltner learned from Mr. Partyka that he was in fact the secret admirer, Ms. Feltner told him that she did not want any gifts from him. Despite this, Mr. Partyka continued to heap unwanted attention on Ms. Feltner. Ms. Feltner complained to Dave Bengs, Title Search's staff attorney, about Mr. Partyka's conduct. Mr. Bengs reported the conduct to Mrs. Partyka, and she ordered Mr. Partyka to stay out of the Closing Department and to leave Ms. Feltner alone. Mr. Partyka, however, did not comply with this order, and was not otherwise reprimanded.
 
 
 5
 Mr. Partyka also called Ms. Feltner at home. Twice, Mr. Partyka called and stated that he was falling in love with her. The first time, Ms. Feltner told Mr. Partyka that the call was unacceptable, that she did not share those feelings, and that he should leave her alone and not call her home again. The second time, she simply threw the phone down in disgust.
 
 
 6
 While on a business trip, Mr. Partyka told another employee that he wanted to marry Ms. Feltner, reverse his vasectomy, and have a baby with her. On this trip, Mr. Partyka also bought a ring for Ms. Feltner. After returning to the office, Mr. Partyka gave Ms. Feltner a picture of a ring, captioned with the words "Is this OK? Walt." Ms. Feltner responded to this harassment by complaining to Mr. Bengs, Mrs. Partyka, Terry Snyder, the office manager, and other employees.
 
 
 7
 One incident was particularly distressing for Ms. Feltner. Although not in her presence, Mr. Partyka made an extremely crude remark about her to another employee.[1] Word got back to her what he said and her reaction was that it scared her to death. In his denial of the defendant's motion for judgment as a matter of law, the district court characterized the remark as an "indirect threat of rape."
 
 
 8
 As a result, Mr. Partyka was told in writing to limit his time in the Closing Department, but was not otherwise reprimanded, and did not follow this written warning. Ms. Feltner even brought her concerns directly to Mrs. Partyka. Ms. Feltner said "Keep your husband away from me." Mrs. Partyka laughed, and walked away.[2] Finally, in September 1994, Ms. Feltner resigned. At the time of trial (two years later), Ms. Feltner had yet to find full-time replacement employment. At oral argument, we were informed that since trial, she had relocated to North Carolina, and had found suitable replacement employment.
 
 
 9
 Ms. Feltner sued under Title VII, and after a three-day jury trial, the jury awarded her $42,000 in back pay, $20,000 in compensatory damages, and $20,000 in punitive damages. Title Search on appeal contends that substantial evidence did not support the jury's finding of liability, and that the jury's award of compensatory and punitive damages was unjustified or excessive.
 
 
 10
 After Title Search filed Appeal No. 97-1087, Ms. Feltner requested that the district court grant attorneys' fees. This request was filed 44 days after the jury's verdict. Because this request was not filed within 14 days of the entry of judgment, the district court denied the request. See Fed.R.Civ.P. 54(d)(2). Ms. Feltner then filed a motion for relief from judgment under Fed.R.Civ.P. 60(b), and the court reversed itself, finding that Ms. Feltner's late filing was the product of excusable neglect. The court then awarded Ms. Feltner over $70,000 in attorneys' fees. Title Search also appeals the granting of the Rule 60(b) motion.
 
 II.
 
 11
 Title Search contends that the jury's finding of liability was unsupported by the evidence. The district court disagreed when it denied Title Search's motion for judgment as a matter of law, and we review that ruling de novo. Tuohey v. Chicago Park District, No. 97-2089, 1998 WL 325181, at * 4 (7th Cir. June 19, 1998). In reviewing the sufficiency of the evidence supporting the jury's verdict, we view the evidence in the light most favorable to Ms. Feltner, we resolve any conflicts in the evidence in her favor, and we grant her the benefit of all reasonable inferences. Id. (citing Frazell v. Flanigan, 102 F.3d 877, 882 (7th Cir.1996)). Only if no rational jury could have found in Ms. Feltner's favor will we reverse the district court's refusal to grant Title Search judgment as a matter of law. Id. And "we are particularly careful in employment discrimination cases to avoid supplanting our view of the credibility or weight of the evidence for that of both the jury (in its verdict) and the judge (in not interfering with the verdict)." Id.; see also Hutchinson v. Amateur Electric Supply, Inc., 42 F.3d 1037, 1042 (7th Cir.1994) (same).
 
 
 12
 To determine whether Ms. Feltner's working environment was hostile or abusive, and therefore actionable under Title VII, we must consider the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, whether it was physically threatening or humiliating, and whether it unreasonably interfered with the employee's work performance. Harris v. Forklift Systems, Inc., 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). "Not every unpleasant workplace is a hostile environment. The occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers would be neither pervasive nor offensive enough to be actionable. The workplace that is actionable is the one that is hellish." Perry v. Harris Chernin, Inc., 126 F.3d 1010, 1013 (7th Cir.1997) (citations and quotations omitted).
 
 
 13
 Ms. Feltner testified that over the 21 months she worked for Title Search, Mr. Partyka harassed her on a daily basis. Much of this harassment was not really offensive, just bothersome. Mr. Partyka would hove over Ms. Feltner and stare at her. He also frequently initiated conversations with her though he had no business purpose in doing so, and though he did not work in the Closing Department, he was frequently there. Other actions were more invasive. He touched her hair, he regularly commented on her appearance, and he discussed with other employees his infatuation with Ms. Feltner. The remarks were frequent and Mr. Partyka was persistent. On more than one occasion, Ms. Feltner exclaimed, "Walt, leave me alone," and Mr. Partyka would do so, but then return shortly and start again.
 
 
 14
 Although not made in her presence, the very crude comment Partyka made to another employee (see fn.1) was extremely distressful to her when she heard about it. Taken in the light most favorable to Ms. Feltner's claim, the district court labeled the remark "an indirect threat of rape." While indirect, it nevertheless contributes to the conduct that adds up to "actionable harassment." See Brill v. Lante Corporation, 119 F.3d 1266, 1274 (7th Cir.1997). Further, Mr. Partyka talked of reversing his vasectomy and impregnating Ms. Feltner, and this talk was also reported to Ms. Feltner. During a business trip, Mr. Partyka bought a ring for Ms. Feltner, and then gave Ms. Feltner a picture of a ring with the written question "Is this OK? Walt." While unwanted attention such as this might be only mildly disturbing in some circumstances, when the attention is given by a supervisor, who is also married to the company's principal owner and president, the harassed employee clearly finds herself in a tangled web: anything she does could antagonize one of the owners of Title Search. We need not belabor the point: Mr. Partyka's sexual advances were both pervasive and unwelcome. And while it may not have prevented Ms. Feltner from performing her work, this is merely one factor to be considered under the totality of the circumstances, and the evidence presented is certainly enough to sustain the jury's verdict.
 
 
 15
 Title Search also asserts that the jury award of $20,000 in compensatory damages for emotional distress is excessive, a product of passion and prejudice. In reviewing the award for compensatory damages, we look at whether the award is monstrously excessive, whether there is any rational connection between the award and the evidence, and whether the award is roughly comparable to awards made in similar cases. E.E.O.C. v. AIC Security Investigations, Ltd., 55 F.3d 1276, 1285 (7th Cir.1995).
 
 
 16
 Title Search relies on Avitia v. Metropolitan Club of Chicago, Inc., 49 F.3d 1219, 1230 (7th Cir.1995). Avitia involved an employee who requested overtime pay, and was subsequently suspended and terminated, all within a four month period. Id. at 1224. The employee then found replacement employment within three months. Id . We reduced the jury's award of damages for emotional distress from $21,000 to $10,500, finding that the evidence at trial did not establish "protracted bitterness." If anything, we see Avitia as supporting the jury's award in this case. Suffering through 21 months of persistent and invasive sexual harassment at the hands of the spouse of the president of the company is certainly more egregious than the situation Avitia found himself in. Moreover, we see this award as roughly comparable to awards given in other cases. See, e.g., Ramsey v. American Air Filter Co., 772 F.2d 1303, 1313 (7th Cir.1985) (nonpecuniary award reduced to $35,000; plaintiff was harassed because of race); E.E.O.C. v. AIC Security Investigations, Ltd., 55 F.3d 1276, 1285-86 (7th Cir.1995) ($50,000 nonpecuniary award; cancer patient fired because of disability/disease). By any standard, the jury's award in this case was not monstrously excessive.
 
 
 17
 Title Search also challenges the jury's award of $20,000 in punitive damages as excessive. Punitive damages are appropriate if the company is engaged in a discriminatory practice with malice or with reckless indifference to the federally protected rights of an aggrieved individual. 42 U.S.C. § 1981a(b)(1). The evidence in the record establishes that Mrs. Partyka and other employees of Title Search were well aware of Mr. Partyka's harassment of Ms. Feltner. Despite this, the company did virtually nothing to stop the harassment. Even after Mr. Partyka's remark that the district court characterized as "an indirect threat of rape," the company took no action to enforce its edict that Mr. Partyka stay away from Ms. Feltner. This evidence is certainly sufficient to warrant the jury's finding of reckless indifference on the part of Title Search.
 
 
 18
 We also do not think that the amount of the punitive damages award, $20,000, is excessive under the circumstances. The punitive damages award was equal to the compensatory damage award (not including back pay), and we have approved similar awards in the past. See, e.g., Timm v. Progressive Steel Treating, Inc., 137 F.3d 1008, 1009-10 (7th Cir.1998) (in Title VII case, the "size of the award ($15,000 after a remittitur) cannot be described as excessive in relation to the harm that unchecked sexual harassment can inflict ."). In fact, complaints about the excessiveness of punitive damages are usually made when the award is a multiple of, not equal to, the amount of compensatory damages. See, e.g., Cooper v. Casey, 97 F.3d 914, 919-20 (7th Cir.1996).
 
 
 19
 With regard to both compensatory and punitive damages, Title Search argues that because the jury deliberated for less than an hour before reaching its verdict, "the jury was motivated by improper reasons, such as caprice and prejudice, when it awarded damages." Ramsey v. American Air Filter Co., 772 F.2d 1303, 1314 (7th Cir.1985). While in some cases, brief jury deliberations may be indicative of a prejudiced jury, in other cases they merely reflect that the case was one-sided, or that the jury members happened to have similar views. Because we see both the compensatory and punitive damage awards as reasonable, if not conservative, we will not infer prejudice from nothing more than the length of the jury's deliberations.
 
 
 20
 Finally, we turn to the district court's decision to change its mind and allow the plaintiff's request for attorneys' fees. The plaintiff filed a motion for reconsideration under Fed.R.Civ.P. 60(b), and Title Search did not respond. The district court reviewed the record, and determined that Ms. Feltner's mistaken belief that she had preserved her request for attorneys' fees was reasonable under the circumstances, and thus her failure to file a request for attorneys' fees within 15 days of the entry of judgment constituted excusable neglect. See. e.g., United States v. Brown, 133 F.3d 993, 996 (7th Cir.1998) (citing Pioneer Investment Services Co. v. Brunswick Associates, 507 U.S. 380, 395, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993)). We review this determination for an abuse of discretion. Id. The pretrial order specifies that Ms. Feltner was seeking attorneys' fees, and the district court had also indicated to counsel that the issue of attorneys' fees would be addressed after trial, but did not fix an exact schedule for that procedure. The district court concluded that from this, it would be reasonable to believe that the requirements of Fed.R.Civ.P. 54 had been met. Also, Ms. Feltner's counsel experienced difficulty with their computer, which delayed their ability to present a complete fee application. While there would have been no abuse of discretion had the district court denied the motion, he did not abuse his discretion in granting it.
 
 
 21
 And Title Search's suggestion that Rule 54 is jurisdictional in nature does not comport with the rule's wording, which permits an "order of the court" to modify its requirements. Local Rule 54.1 of the Northern District of Indiana, which has the force of a court order, provides that "[t]his time may be extended by the court for good cause shown." Obviously, the discretion to modify a deadline is incompatible with the deadline being jurisdictional. Lorenz v. Valley Forge Ins. Co., 23 F.3d 1259, 1261 (7th Cir.1994) ("Some rules not only establish time limits but also limit or forbid extensions, and action taken after the time allotted by these rules may be said to exceed the court's power, and hence its 'jurisdiction .' ... Because the district court could enlarge the time to object to the award of costs, it is impossible to characterize a filing one day late as depriving the court of 'jurisdiction." '). The district court had jurisdiction, and in fact the obligation, to entertain (but of course not necessarily grant) Ms. Feltner's Rule 60(b) motion.
 
 
 22
 In sum, the jury acted reasonably and in accord with its view of evidence presented in finding Title Search liable, and assessing damages. Moreover, the district court did not abuse its discretion in granting Ms. Feltner relief from its order striking its request for attorneys' fees on account of excusable neglect.
 
 
 23
 AFFIRMED.
 
 
 
 [1]
 While on a marketing trip, Mr. Partyka told another employee that, with regard to Ms. Feltner, "he would like to tie her up and f __k her." (Mr. Partyka testified that in fact, he stated that she needed to be tied up and f __ked, but never stated that he would do that.) This employee reported these comments to Mr. Bengs, who then directed the employee to tell Ms. Feltner
 
 
 [2]
 While it may seem peculiar to find a husband engaging in sexual harassment while the wife works in the same office, we note that Hibben v. Nardone, 137 F.3d 480 (7th Cir.1998), involved a very similar factual setting