**Timothy WYSE, Plaintiff,**

v.

**Lawrence H. SUMMERS, Secretary of the Department of the Treasury, Defendant.**

**No. CIV. A. 99–10184–PBS.**

United States District Court,
D. Massachusetts.

June 15, 2000.

Peter H. Noone, Avery, Dooley, Post & Avery, Belmont, Kathleen Kubicki, Detroit, MI, for Timothy Wyse, Plaintiffs.

Donald K. Stern, Rayford A. Farquhar, United States Attorney's Office, Joyce London Alexander, Mag. Judge, United States District Court Office of the Clerk, Boston, for Robert E. Rubin, Secretary, Dept. of the Treasury, Joyce London Alexander, Mag. Judge, ADR Providers.

## MEMORANDUM AND ORDER

SARIS, District Judge.

### I. INTRODUCTION

Plaintiff Timothy Wyse, a white male employed as a criminal investigator with the Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms ("ATF"), received a 10 day suspension for his investigative activities on the Cape Cod Task Force ("CCTF"). Wyse alleges that the suspension violated Title VII of the Civil Rights Act 1964 in two ways. First, he claims reverse race discrimination because another agent, an African–American male, did not receive commensurate discipline for a similar infraction. Second, he claims that his suspension and other disciplinary "counseling" for tardiness were in retaliation for his role as a witness in Special Agent Karen Carney–Hatch's ("Carney–Hatch") discrimination complaint against ATF.

The government moves for summary judgment pursuant to Fed.R.Civ.P. 56(c). After hearing, defendant's motion for summary judgment is *ALLOWED.*

### II. FACTS

The Court treats the following facts as undisputed, unless otherwise noted:

### 1. The Carney–Hatch Incident

The plaintiff has been a Special Agent with ATF since July, 1988. In 1994, ATF Special Agent Carney–Hatch, a co-worker, filed a sexual harassment claim against ATF, naming Jack Dowd ("Dowd"), Stephen Raber ("Raber"), Thomas Lambert ("Lambert") and Terence McArdle ("McArdle") as co-defendants. On May 11, 1994, the plaintiff provided an affidavit to ATF in support of Carney–Hatch's discrimination claim.[1] On March 28, 1995, the plaintiff wrote a sworn statement in support of Carney–Hatch.[2]

Five months after the plaintiff's involvement in the Carney–Hatch complaint, McArdle reported the plaintiff for losing evidence on August 16, 1995.

### 2. The Cape Cod Investigation

#### a. Wyse's undercover purchases.

On January 27, 1998, ATF assigned the plaintiff to the CCTF to make narcotics purchases in an undercover capacity. Seref McDowell ("McDowell"), an African-American agent, was also assigned to the CCTF on January 22, 1998. The CCTF was a task force that used confidential sources to purchase narcotics from target suspects. The CCTF was comprised of personnel from the Drug Enforcement Administration, Massachusetts State Police, Internal Revenue Service, ATF and various local police departments. Technically speaking, the plaintiff was detailed from Group I to Group IV. Group IV Supervisor John J. Dowd, Jr. (white) was the responsible ATF supervisor for the investigation. Sandra LaCourse ("LaCourse"), also white, was the case agent. Frank Hart was plaintiff's Group I Supervisor of the Arson Group. Assistant Special Agent Lambert was in charge of the whole Boston Field Division.

While at CCTF, the plaintiff and the confidential source were involved in the purchase of narcotics from various targets on January 27, 1998 and February 6, 1998. On February 8, 1998, LaCourse, who was the case agent responsible for managing the investigation, called the plaintiff to ask him about the status of the investigation. The plaintiff informed her that the task force planned to have the plaintiff make another undercover purchase that day. LaCourse told the plaintiff she would advise Dowd, LaCourse's supervisor, of the task force's plan. Dowd told LaCourse to inform Wyse not to continue with plans to make this undercover purchase.

After speaking with Dowd, LaCourse informed the plaintiff that Dowd had a

---

**1.** The affidavit provided:

On 2/25/94, 3/21/94 and 3/25/94, I was assigned as the duty agent at the Boston Field Division sometime between the hours of 1800–2400 [hours]. I received a telephone call from Alice Collins. Ms. Collins advised that she was attempting to reach or speak to Special Agent Karen Carney. I advised Ms. Collins, Special Agent Carney was not available.

After general conversation, I advised Ms. Collins I would let S.A. Carney [know] that Ms. Collins had called. I did not record this telephone [message] in the log book. Sometime after this conversation, I advised S.A. Carney that Ms. Collins had called and was looking for her.

**2.** The statement provided:

On or about May 20, 1994, I had a conversation with Alice Collins while I was duty agent. It was my recollection that Ms. Collins called me. During this conversation, Ms. Collins told me of the dispute between her and agent Carney.

I told Ms. Collins that I was really not interested in the content of the dispute. But, I did advise her that life was too short and that she should try to work out the situation between herself and Agent Carney.

Ms. Collins said she wanted to but she (Ms. Collins) had already mentioned to G/S Dowd about her dispute with Agent Carney. According to Ms. Collins, G/S Dowd had recommended that Ms. Collins further pursue the matter with ATF Internal Affairs.

I reiterated to Ms. Collins that she should just try to work out her problem with Agent Carney without involving Internal Affairs. Ms Collins stated that she wanted to do that.

To be fair to G/S Dowd, I can not verify if in fact Ms. Collins even spoke to G/S Dowd about this matter as I did not directly hear or observe Ms. Collins speak to G/S Dowd about this matter.

problem with the narcotics purchase. The nature of the plaintiff's second conversation with LaCourse is hotly disputed. The plaintiff claims that LaCourse stated Dowd did not want the plaintiff to make the narcotics purchase by himself, and that the plaintiff responded he would be with a Confidential Source ("CS"). The plaintiff further claims that LaCourse stated that as long as the plaintiff was with the CS, the narcotics purchase would be fine. Both LaCourse and Dowd, however, claim LaCourse told the plaintiff not to conduct the undercover purchase at all. Wyse claims he never received any order from any ATF manager that he was not to proceed with the undercover work.

On February 14, 1998, LaCourse read a DEA report prepared by the plaintiff indicating that the plaintiff himself conducted the undercover narcotics purchase on February 8, 1998. LaCourse reported the incident to Dowd. On March 3, 1998, Dowd requested the plaintiff to provide details regarding his activities while assigned to the investigation. He also requested a report from LaCourse who informed him that she called Wyse and "told him that he was instructed by the front office not to conduct the U/C buy." Eventually, on April 10, 1998, plaintiff submitted a statement concerning his narcotics purchases on January 27, February 6, and February 8, 1998. On April 14, 1998, Dowd sent plaintiff a memorandum stating that the April 10 memo was inaccurate.

On May 1, 1998, Karen Carney–Hatch attended an EEOC Mediation in Boston. She advised ATF counsel that Wyse was being harassed by ATF management and that Dowd was acting irrationally.

Thomas J. Lambert (white), Dowd's supervisor and the Assistant Special Agent in charge of the Boston Field Division, reviewed the reports of LaCourse and Dowd and the plaintiff's statement and issued a notice of proposal on May 18, 1998 to suspend the plaintiff for 45 calendar days. The proposed action was based on the following reasons. First, plaintiff allegedly failed to complete an ATF Operational Risk Assessment and Plan required for undercover operations and submit it to an ATF supervisor for approval. Second, plaintiff allegedly failed to obtain ATF supervisory approval prior to conducting the undercover operations. Third, defendant charged, plaintiff intentionally disregarded a direct order from Group Supervisor Dowd (via Special Agent LaCourse) not to proceed with any undercover operation scheduled for February 8, 1998. Plaintiff was also charged with refusing to obey a direct order to timely provide information about this investigation while detailed to Group IV, and with providing misleading information to LaCourse and Dowd.

### b. The comparator's undercover role and discipline.

McDowell, an African–American agent, was also involved in undercover activity while at CCTF. On January 25, 1998, McDowell accompanied a CS in order to make a narcotics purchase. McDowell did not file an Operations Plan prior to making the purchase, and has stated that he was under the impression that an Operations Plan did not need to be filed since the CCTF was involved with the ATF. The next day, January 26, 1998, McDowell told Dowd about the undercover purchase he had made with the CS. Dowd informed McDowell that an Operations Plan should have been filed with ATF so that a supervisor could review it.

### c. The Summer of 1998.

On July 13, 1998, the plaintiff read a file concerning the undercover work done by McDowell, and determined that McDowell's undercover activities were comparable to his but that his sanction had been less severe (i.e. a reprimand versus a 45 day proposed suspension.) The plaintiff filed a race discrimination and retaliation claim with the EEOC on July 21, 1998.

On August 6, 1998, Dowd sent a formal counseling letter to McDowell, *after* the

plaintiff noted that there was no evidence of counseling with respect to McDowell's activity. McDowell was counseled that he should have filed an Operational Risk Assessment and Plan for his role in the undercover operation for the CCTF.

On August 20, 1998, plaintiff made an oral presentation of his defense regarding Lambert's charges. At that time, Charles Thompson was the deciding official.

### d. Other disciplinary action.

Plaintiff received criticism from supervisors on other occasions as well. Three months after the plaintiff's proposed suspension, plaintiff was disciplined for being late for duty. On July 24, 1998, plaintiff was supposed to arrive at work at 4:00, but did not arrive until 5:15 due to traffic. On August 4, 1998, Lambert told Hart to talk to the plaintiff about his tardiness.

On February 1, 1999, plaintiff filed this lawsuit. On February 4, 1999, Dowd wrote a memorandum to Hart expressing his concern over a series of events that took place on February 1 and 2, 1999. On these dates, the plaintiff was involved in an undercover operation where he met a suspect without electronic surveillance and without an approved Operations Plan. Two months later, Lambert wrote an incident report because the plaintiff allegedly falsified a report on April 9, 1999.

### e. The suspension.

Pirotte, the Director/Special Agent in charge of the Boston Field Division, was appointed after Charles Thompson's retirement and thereafter was the deciding official. On February 9, 1998, Pirotte scheduled a second oral presentation regarding plaintiff's CCTF undercover activities. Although he found that most of the reasons had not been sustained, he upheld the charge of insubordination, stating:

I have personally verified the above facts, and in particular, I asked S/A LaCourse if she were sure that you knew you were instructed not to proceed with the undercover operation. She was very firm in her response that she was absolutely certain that you were fully aware of the order instructing you not proceed with the undercover operation that evening.

When you functioned in an undercover capacity at 9:00 p.m., February 8, 1998, you did so knowing full well that you were ordered more that once, and with absolute clarity, not to proceed. I do not find your response that you did not receive the instruction not to participate in the undercover operation that evening very persuasive.

Your behavior in this instance constitutes a willful violation of a direct and lawful order and merits appropriate disciplinary action.

On July 9, 1999, Pirotte suspended the plaintiff for 10 days for intentionally disregarding a direct order from a supervisor.

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter or law." *Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 36 (1st Cir.1995) (quoting Fed R. Civ. P. 56(c)). To prevail on summary judgment, the moving party must show that there is an absence of evidence to support the nonmoving party's position. *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir.1990); *see also, Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party satisfies this requirement, the burden shifts to the nonmoving party to establish the existence of at least one factual issue that is both genuine and material. *See LeBlanc v. Great American Ins. Co.*, 6 F.3d 836, 841 (1st Cir.1993); *see also, Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct.

2505, 91 L.Ed.2d 202 (1986). To successfully oppose summary judgment, the non-moving party "may not rest upon mere allegation or denials of his pleading," but must set forth specific facts showing that there is a genuine issue for trial. *LeBlanc*, 6 F.3d at 841 (quoting *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505). If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *See Rogers*, 902 F.2d at 143 (quoting *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505) (citations omitted). The Court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Barbour*, 63 F.3d at 36.

## IV. DISCUSSION

### 1. Timeliness of the EEO Counseling Regarding Retaliation [3]

Defendant argues that plaintiff's allegations of retaliation are barred by the requirement that federal employees wishing to file suit under Title VII must first seek EEOC counseling within 45 days of the alleged discriminatory acts.[4]

EEOC regulations require an employee suing the federal government to exhaust certain remedies before initiating a suit in the district court. *See Boos v. Runyon*, 201 F.3d 178, 181 (2d Cir.2000). Congress envisioned "a dispute resolution system that requires a complaining party to pursue administrative relief prior to court action, thereby encouraging quicker, less formal and less expensive resolution of disputes within the Federal Government and outside of court." *West v. Gibson*, 527 U.S. 212, 218–19, 119 S.Ct. 1906, 144 L.Ed.2d 196 (1999). An aggrieved agency

employee must first seek EEO counseling within 45 days of the "matter alleged to be discriminatory" or the "effective date" of the personal actions. 29 C.F.R. § 1614.105(a)(1). Should informal resolution efforts prove unsuccessful, the aggrieved person will be informed of his right to file an administrative complaint. *See* 29 C.F.R. § 1614.105(d). The employee must file his complaint within 15 days of the receipt of the notice. *See* 29 C.F.R. § 1614.106(b). In certain circumstances, the forty-five day requirement is subject to equitable tolling. *See Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 386, 102 S.Ct. 1127, 1129, 71 L.Ed.2d 234 (1982).

██ A federal employee's failure to contact an EEO counselor within the forty-five day period, or some valid extension, causes him to lose his right to pursue a later *de novo* action in court. *See Roman–Martinez v. Runyon*, 100 F.3d 213, 216 (1st Cir.1996). The critical inquiry in evaluating a claim of lack of timeliness is when the plaintiff knew or should have known that she was being discriminated against; a plaintiff cannot avoid the statute of limitations if plaintiff is on inquiry notice of discrimination. *See Desrosiers v. Great Atlantic & Pacific Tea Co.*, 885 F.Supp. 308, 312 (D.Mass.1995); *Bonds v. Heyman*, 950 F.Supp. 1202, 1206–07 (D.D.C. 1997) (denying summary judgment on lack of timeliness when plaintiff sought counseling within 45 days of the time she knew she would never be promoted).

██ Plaintiff agrees that there was no triggering event within the forty-five days, but argues that his review of McDowell's file gave him reason to believe he had been

---

**3.** The government did not seek summary judgment regarding the timeliness of the claim of race discrimination.

**4.** 29 C.F.R. § 1614.105(a) states:
(a) Aggrieved persons who believe they have been discriminated against on the basis of race, color, religion, sex, national origin, age or handicap must consult a Counselor prior to filing a complaint in

order to try to informally resolve the matter.
(1) An aggrieved person must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action.

targeted for suspension based on retaliatory practices. Specifically, he states that he first learned that ATF was arguably discriminating against him based on impermissible racial or retaliatory motivation on July 13, 1998, when he discovered that McDowell, an African–American male, had worked undercover in a similar capacity and did not receive similar disciplinary action. He argues that he is entitled to equitable modification of the 45 day period because he was unaware or actively misled as to the motivation behind his proposed suspension. *See Jensen,* 912 F.2d at 521. Therefore, this Court must determine whether plaintiff's own actions and words demonstrated sufficient knowledge regarding a retaliatory motive to have set the investigation apparatus in motion at the time he received the notice of proposal on May 18, 1998.

Plaintiff argues that at the time he received the May 21, 1998 proposal letter, he "only had a feeling that the proposal to suspend him could be motivated by retaliation." However, as in *Jensen,* the defendant's own words undercut this assertion. In his "Statement of Charges" submitted to the EEOC counselor, he reports "instances of retaliation" as a result of his role in the Carney–Hatch affair. He states that in July 1995, he was involved in an investigation with the Lowell Police Department, DEA, and ATF, and was advised he was no longer allowed to continue his role as an undercover agent, for no reason. Again, on August 25, 1995, plaintiff was allegedly not allowed to effect an arrest warrant for the first time during the course of his employment with ATF. In February 1998, he was removed from the drug investigation with the Cape Cod Task Force. In Paragraph 18 of his statement to the EEOC, he states:

> In or around October of 1995, I had a conversation with S/A Carney relative to ATF management in the Boston Field Office. I told S/A Carney that I felt I was being retaliated against by the ATF upper management due to the fact that I

had provided statements to TD—Case 94–3259 and IA investigation 95–0001. At that time I thought it would stop.

Ms. Carney–Hatch also submitted an affidavit stating that she accompanied her attorney, Kathleen Kubicki (who has been Wyse's attorney throughout these proceedings) and informed the EEOC mediator that Wyse had provided her with two affidavits "and would possibly be retaliated against because of it." Carney–Hatch also states that she personally experienced retaliation from Dowd.

The closing report to the Assistant Director of Inspection included an interview with Wyse on October 19, 1998. He stated that he told Carney–Hatch in *October 1995* that "he was being retaliated against by ATF upper management because he provided statements" in her EEO case. Once again Wyse pointed to four instances from 1995 to 1998 when he believed he was not permitted to act in an undercover capacity because of his support for Carney–Hatch.

The EEOC dismissed the complaint of retaliation because it was not brought to the attention of an EEOC counselor in timely manner and there were insufficient reasons to extend the 45-day time frame. After a written request for reconsideration, the agency reaffirmed its position, stating:

> It is undisputed that Complainant sought EEO counseling on July 21, 1998. The 45 day period for timeliness thus begins June 06, 1998, i.e. any event occurring on June 06, 1998 or later would have been timely brought to the counselor. The report of counseling includes various documents that led to our decision to dismiss the complaint, and they are enclosed. As you will note, on March 31, 1998, Complainant wrote that he had been the victim of what he termed was "a personal agenda" between March 31, 1993 and March of 1998. He also stated that management had denied him the same opportunities that other agents were afforded. Additionally, in a written statement he pro-

vided to the EEO Counselor, Complainant stated that in or around October 1995, "I had a conversation with S/A Carney that I felt I was being retaliated against by ATF upper management due to the fact that I had provided statements" regarding an EEO investigation. Clearly, at any point during this time Complainant could have entered the EEO counseling process. Lastly, Complainant's signed statement to the EEO Counselor goes on to say that in May, 1998, "S/A Carney told me that on May 01, 1998, she and attorney Kaye Kubucki (sic) informed ATF attorney Elaine Smith and the EEOC mediator of possible retaliation against myself and G/S Hart for providing statements relative to S/A Carney's EEO complaint." In view of all this we concluded that Complainant's contact with the EEO Counselor was untimely. Therefore, I cannot honor your request to rescind our decision.

After a close review of the record, I agree with the EEOC that plaintiff had sufficient knowledge of possible retaliation to trigger the requirement of seeking informal counseling when he received the notice of proposed suspension. Thus, even if the notice of proposed suspension was part of a continuing violation, *see Thomas v. Eastman Kodak Co.,* 183 F.3d 38, 53 (1st Cir.1999), failure to institute informal counseling in a timely fashion requires that the claim of retaliation be dismissed.

### 2. Race Discrimination Claim [5]

 When there is no direct evidence of discrimination, Title VII claims are analyzed under the well-worn test set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and two subsequent Supreme Court cases, *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089,

67 L.Ed.2d 207 (1981); and *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Under this analytical scheme, the employee bears the initial burden of raising an inference of discrimination by making a prima facie showing of possible discrimination. *See McDonnell Douglas,* 411 U.S. at 802–05, 93 S.Ct. 1817. Generally speaking, in a race discrimination claim this requires the plaintiff to establish that: (1) he was a member of a protected class; (2) he was subject to an adverse employment action; (3) he was qualified for the job; and (4) for the same or similar conduct he was treated differently than similarly situated employees. *See id.* at 802, 93 S.Ct. 1817.

With respect to the fourth element, a plaintiff should be able to provide comparative evidence in order to raise an inference that others similarly situated to him in all relevant respects were treated differently by the employer. *See Conward v. The Cambridge School Committee,* 171 F.3d 12, 20 (1st Cir.1999); *see also Thomas v. Digital Equipment Corp.,* 702 F.Supp. 22, 25 (D.Mass.1988) (in disparate treatment cases, the plaintiff must show he was treated differently from similarly situated employees).

If an employee establishes a prima facie case, it is presumed that the employer engaged in impermissible discrimination and the burden of production shifts to the defendant. *See LeBlanc,* 6 F.3d at 842; *St. Mary's Honor Center,* 509 U.S. at 507, 113 S.Ct. 2742. The employer must then articulate a legitimate non-discriminatory reason for the challenged conduct. *See Woods v. Friction Materials, Inc.,* 30 F.3d 255, 260 (1st Cir.1994); *Burdine,* 450 U.S. at 255–256, 101 S.Ct. 1089. The employer's burden is one of production; the burden of persuasion remains with the defen-

---

**5.** The government did not move to dismiss the race discrimination claim. Arguably, plaintiff failed to exhaust his remedies by not requesting counseling after the suspension of 10 days, especially since the EEOC dismissed the initial claim as premature. The EEOC dismissed the challenge to the proposed suspen-

sion: "A proposed personnel action is not considered an act of discrimination since nothing has actually occurred to cause the complainant harm to a term or condition of his employment." However, this issue is waived.

dant at all times. *See St. Mary's Honor Center,* 509 U.S. at 507, 113 S.Ct. 2742.

Once the defendant has articulated its legitimate non-discriminatory reason, the plaintiff must present sufficient evidence to show that the employer's articulated reason for the adverse action is pretext, and that the true reason is discriminatory. *See Thomas,* 183 F.3d at 56 (quoting *Udo v. Tomes,* 54 F.3d 9, 13 (1st Cir.1995)). In other words, the First Circuit requires that the plaintiff prove "pretext-plus." *Id.* "Pretext-plus" may be proven though the elimination of other plausible non-discriminatory reasons until the most plausible reason remaining is discrimination. *See id.* at 61.

Here, the fourth element of the prima facie case, establishing different treatment for the same or similar conduct, is critical. The government argues that Wyse's misconduct was not comparable because McDowell never conducted an undercover purchase while at the CCTF and immediately reported his undercover activities to his supervisor. Moreover, the government argues, plaintiff was expressly ordered not to engage in undercover activity and violated that order. In contrast, the argument continues, McDowell was never told not to conduct an undercover narcotics purchase. Viewing the facts and drawing all reasonable inferences in a light most favorable to the plaintiff, I must assume that LaCourse did not order the plaintiff to refrain from conducting an undercover narcotics purchase. Based on such facts, plaintiff has met his not onerous burden of proving that McDowell and the plaintiff were similarly situated, but were treated differently, because the plaintiff was suspended for his actions while McDowell was not.

The defendant has articulated the following sole reason for the suspension: insubordination in his refusal to obey a lawful order. The articulated reason satisfies defendant's burden of production.

Plaintiff's case falls apart at the third stage, as the burden of proof ping-pongs back to him to produce sufficient evidence to show that the true reason for the differ-

ential discipline is racial discrimination. Even if LaCourse did not actually pass on Dowd's order to refrain from conducting an undercover purchase, the evidence is uncontroverted that she told the decision makers (Lambert for the proposed suspension and Pirotte for the final decision) that she proscribed the conduct. The undisputed evidence is that the ultimate decision maker (Pirotte) believed Wyse violated a direct order. Even if Pirotte were mistaken, Wyse did not produce a scintilla of evidence that the reason he was suspended was racial.

### 3. *Counseling*

■ Plaintiff argues that the counseling he received for being late on August 4, 1998 was in retaliation for his role in the Carney–Hatch incident and for his filing the July 21, 1998 EEOC complaint. Defendant argues that "counseling" is not an adverse action. The EEOC did not address this claim, although it was presented during the informal counseling session. An employee suffers an adverse action when he suffers personal loss or harm with respect to "a term, condition, or privilege of employment." *Randlett v. Shalala,* 118 F.3d 857, 862 (1st Cir.1997). Here, because there were no tangible job consequences attributable to the counseling statement, the counseling was not an adverse employment action. *See Sweeney v. West,* 149 F.3d 550, 556 (7th Cir.1998). This is the kind of *de minimis* employment hand-slap which falls beneath the radar screen of Title VII. *See Williams v. Bristol–Myers Squibb Co.,* 85 F.3d 270, 274 (7th Cir.1996) ("Otherwise every trivial personnel action that an irritable, chip-on-the-shoulder employee did not like would form the basis of an administrative suit.").

### VI. ORDER

Therefore, it is hereby **ORDERED** that the defendant's motion for summary judgment is **ALLOWED.**